**Paul W. LYNCH et al., Appellants,**

v.

**DAWSON COLLIERIES, INC., et al.,
Appellees.**

Court of Appeals of Kentucky.

Sept. 22, 1972.

Milburn C. Keith, Keith & Kirkham, Hopkinsville, D. Paul Alagia, Jr., Brown, Miller, Alagia & Senn, Louisville, for appellants.

William D. Becker, Louisville, Earle M. Nichols, Nichols, Nichols & Adams, Madisonville, for appellee, Dawson Collieries, Inc.

J. David Grissom, Edwin H . Perry, Greenebaum, Grissom, Doll, Matthews & Boone, Louisville, for appellee The Kentucky Trust Co.

CULLEN, Commissioner.

In 1966, Dawson Collieries, Inc., ceased doing business and a pension plan which it was carrying for its employes was terminated. According to the terms of the pension plan the benefits to which each employe was entitled upon termination of the plan were calculated, paid to the employe, and accepted by him in full satisfaction of his rights. After these payments were made there remained in the fund a balance of slightly more than $100,000. The "Pension Committee" voted to distribute this amount among the employes as additional pension benefits. The company objected and a suit was brought by three of the employes, undertaking to sue for themselves and as representatives of all other participants in the pension plan, against the company and the trustee of the pension system, in which the plaintiffs sought an adjudication that the surplus in the fund belonged to the participating employes. The circuit court entered judgment declaring that the company was entitled to the surplus. The three employes appealed but the appeal was dismissed as to two of them, leaving only one as appellant.

The pension plan was established originally in 1953, by Dawson Collieries and four associated companies. In 1961 the other four companies were liquidated, and Dawson Collieries continued as the sole operator, picking up such of the employes of the other four companies as chose to transfer employment to Dawson. The plan was financed solely by contributions by Dawson (and the other companies up until 1961). The total contributions by the companies were $325,210.

The amount distributed to the participating employes when Dawson ceased doing business was $275,761. The surplus that remained came primarily from a gain in the market price of investments. The evidence was that the investments were sold, in anticipation of liquidation of the company, at a peak market.

The main issue in the case revolves around a provision of the pension trust agreement that upon termination of the plan no part of the fund or its income should be paid to the company "except amounts that may arise from erroneous actuarial calculations and after satisfaction of all liabilities hereunder shall revert to the Companies," and a similar provision of the pension plan that "any funds remaining after the satisfaction of all liabilities to Members, retired Members, disabled Members, beneficiaries and contingent beneficiaries under this Plan and due to erroneous actuarial calculations may be returned to the Companies." In substance, the appellant maintains that "erroneous actuarial calculations" means *mistakes*, that there were no mistakes, and therefore the company is not entitled to the money. On the other hand, the company argues that "erroneous actuarial calculations" means simply a variance between actual experience of the plan and its reasonably anticipated experience. The circuit court accepted that argument, and so do we.

A regulation of the Internal Revenue Service, promulgated to implement provisions of the internal revenue law relating to qualification of pension plans for income tax benefits, states:

"* * * A balance due to an 'erroneous actuarial computation' is the surplus arising because actual requirements differ from the expected requirements even though the latter were based upon previous actuarial valuations of liabilities or determinations of costs of providing pension benefits under the plan and were made by a person competent to make such determinations in accordance with reasonable assumptions as to mortality, interest, etc., and correct procedures relating to the method of funding."

This particular regulation was not adopted until 1956 (three years after the plan here in issue was created), but the evidence was that the plan was drafted to meet Internal Revenue requirements and was approved by that agency, and it is reasonably apparent that the provision forbidding return of any surplus to the company unless the surplus was due to "erroneous actuarial calculations" was inserted in the plan to meet Internal Revenue requirements. See 33 Am.Jur.2d, Federal Taxation, sec. 3410(5), p. 816.

The purpose of the requirement of such a provision would be to prevent the employer-company from obtaining a tax advantage by deliberately and intentionally over-funding a pension plan with the view of recovering the surplus upon termination of the pension plan in a favorable tax situation. In effect, the Internal Revenue Service has said it will permit a surplus resulting from over-funding to be returned only if the over-funding was done in actuarial good faith. Absent such a requirement, there is no logical reason why the company would so qualify its right to return of any surplus.

Of necessity, actuaries must make assumptions, and use arbitrary factors, such as interest rates, to project future needs. Investment *costs* ordinarily will be used, rather than current market values, because of fluctuation of the latter. The actuary for the plan here in issue testified that according to established actuarial practice he used investment cost rather than current market value, and he projected the needs of the plan on the basis of indefinite continued operation. He said that the surplus in the fund at the time of dissolution was due to two factors: First, the enhancement in market value of the securities; and, second, the early termination of the plan. We think that this is exactly the kind of "erroneous actuarial calculation" the pension documents had in mind.

The appellant argues, however, that under the terms of the pension trust agreement the Pension Committee had "the exclusive right of interpreting the Plan," and the committee by voting to distribute the surplus among the participating employes interpreted the plan as so authorizing. We think the argument has no merit. It is plain from the context of the agreement that the right of interpretation related only to benefit qualifications and not to what constituted the benefit fund, because the agreement stated that the committee's interpretations should be conclusive as to members and beneficiaries but made no suggestion of their being conclusive as to the company. The pension documents stated clearly that the *amount* of benefits to be paid to any member could only be such as was certified by the actuary. Furthermore, after the committee voted to distribute the surplus among the participating employes, the committee members were removed by the company (as it had the right to do under the pension documents), and thus nothing that fairly could be considered an advised interpretation of the plan ever was made by the committee.

The appellant suggests that some kind of estoppel should arise because a booklet explaining the pension plan that was distributed to the members indicated that any surplus eventually accruing in the fund would be distributed to the members, and because some annual reports indicated that benefits would be computed on market values of investments. There is no evidence that anyone relied on such representations to his detriment, which ordinarily is required for an estoppel; but of more significance is the fact that no employe could have relied on any such representation because contributions to the pension plan were wholly voluntary on the part of the company, and the company could have ceased making contributions at any time, so there was no basis for an anticipation that there would be a surplus at any future date.

The appellant asserts that the circuit court failed to make appropriate findings of fact and conclusions of law, as re-

quired by CR 52.01. That rule states that if an opinion is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. In the instant case the issue was primarily one of law and the written opinion of the trial judge made perfectly clear what his conclusion was. We think there was a sufficient compliance with the rule.

The judgment is affirmed.

STEINFELD, C. J., and HILL, PALMORE, REED, MILLIKEN and NEIKIRK, JJ., concur.

OSBORNE, J., not sitting.