**MONUMENTAL LIFE INSURANCE CO., Plaintiff,**

**v.**

**NATIONWIDE RETIREMENT SOLUTIONS, INC., Defendant.**

**Civil Action No. 3:00–CV–589(H).**

United States District Court,
W.D. Kentucky,
At Louisville.

Jan. 23, 2003.

David B. Tachau, Richard V. Evans, Tachau, Maddox, Hovious & Dickens, Louisville, KY, for Plaintiff/Counter–Defendant.

Fordham E. Huffman, Ronald E. Laymon, Jones, Day, Reavis & Pogue, Columbus, OH, for Defendant/Counter–Claimant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiff Monumental Life Insurance Co. ("Monumental") brought this action against Defendant Nationwide Retirement Solutions, Inc. ("NRS") to recover for losses sustained due to NRS's alleged breach of contract and the related duties arising from their business relationship. Both parties have filed cross motions for summary judgment. In its motion, Monumental moves for a judgment as a matter of law on Counts I and II, and to dismiss NRS's counterclaims. Such a ruling would leave a trial only to determine damages. Though arguing vigorously that it is not liable under any of Monumental's theories, NRS asks the Court to focus on a more narrow period of time—connected to the so-called 1998 restructuring—and hold that its actions prior to 2000 did not abridge its contractual duties. NRS has also moved to limit Monumental's damages due to its failure to mitigate or waiver by renewing the contract.

In the course of the foregoing discussion and analysis, the Court concludes that Monumental cannot assert claims based upon NRS's actions prior to January, 2000. As a consequence of these decisions, the trial should be streamlined and the parties focused on the issues in dispute.

## I.

Both parties are engaged through different means in the distribution of insurance polices. Monumental is a major provider of universal life insurance policies.[1] NRS sells and administers retirement plans to state and local government employees, which include insurance plans. The plans NRS sells are commonly referred to as "457 plans," named after the section of the Internal Revenue Code that establishes their tax advantaged treatment. Through these 457 plans, a government employee may defer compensation on a pre-tax basis through payroll deduction. As a 457 plan provider, NRS and its predecessor, Public Employees Benefit Service Corporation ("PEBSCO"), offered public sector employees their choice of several tax-deferred investment alternatives as part of their 457 plan packages. Among the options employees could select from were variable annuities, fixed annuities, mutual funds and Monumental's life insurance products. The 457 plans are the government equivalent of 401k plans and participation in them is voluntary.

On September 30, 1981, several Monumental predecessors (The Peoples Security Life Insurance Co., Commonwealth Life Insurance Co., Georgia International Life Insurance Co., and National Home Life Assurance Co.) and PEBSCO entered into the General Agent Agreement. In that Agreement, Monumental's predecessors appointed PEBSCO as their "General Agent" and authorized it to sell Monumental's universal life insurance products in its 457 plans. As part of this agreement, PEBSCO was authorized to solicit and procure applications for Monumental's universal life insurance policies, enroll participants, and pay sales agents. In return, Monumental compensated PEBSCO under a commission schedule set out in the General Agent Agreement. Having established this relationship, the two sides later formed a series of agreements with third-party organizations, such as state and local governments.

The two of these three-way agreements on which Monumental now bases its claims are those with the National Association of Counties ("NACo"), first executed on October 1, 1986, and the U.S. Conference of Mayors ("USCM"), first executed on March 31, 1987. Under these agreements, the NACo and USCM organizations agreed to recommend NRS as the 457 plan administrator for their member counties and cities. These agreements further provided that NRS would make Monumental the exclusive life insurance provider for participants in these 457 plans. Thereafter, NRS would negotiate with county or city employee groups to provide benefit packages and options designed to their specifications. For over ten years, NRS marketed its products, including Monumental's insurance products, in a similar manner. Then in 1997 and again in 2001,

---

**1.** Universal policies operate like "whole life insurance policies" with an investment twist. Under a whole life policy, a purchaser agrees to pay regular premiums to an insurance company in exchange for a specified benefit payable to her spouse or other beneficiaries upon her death. Earnings on a whole life policy are set by the insurance company based on the overall rate of return on its investment. In contrast, in a universal policy, the purchaser sets the premium and the death benefit. The premiums purchasers pay to the insurance company go into a policy attached to an investment. The coverage provided by the policy is therefore tied to the strength of the invested premium's performance.

NRS altered its marketing approach for the 457 plans. The parties now dispute whether NRS has met its obligations to Monumental under both the NACo and USCM agreements, as a result of these changes.

The first series of changes occurred in early 1997 when Duane Meek was appointed president of PEBSCO and then oversaw the merger of PEBSCO and another business entity, NEA Valuebuilder Services, Inc. ("NEAVIS"). That restructuring ("1998 restructuring") revised the compensation schedule for all field agents, effective in 1998. In short, the 1998 restructuring provided that the commission rates for agents on life insurance sales would be reduced from approximately 40 to 25 percent of first-year premiums. Commissions on non-life insurance products remained at about five percent. Thereafter, sales of Monumental's life insurance products, which had averaged a 16 percent annual increase from 1993 to 1997, abruptly dropped, falling 26 percent in 1998, and another 36 percent in 1999.

On January 13, 2000, NRS announced additional marketing changes known as the "Saturn Program."[2] Under the Saturn Program, NRS eliminated its commissioned sales force and replaced it with new account acquisition managers, salaried retirement education specialists, direct marketing efforts, and expanded internet capabilities. In other words, claiming to respond to market demands, NRS shifted from marketing its 457 plans in the field through a commission-based sales force focused on sales, to a combination of educational seminars for employees and information provided over the internet. (Holland Dep. at 55:1–4.)

According to NRS, of approximately 350 commissioned agents employed before the Saturn Program, around 220 were rehired as salaried, retirement specialists. An additional 50 employees dealt with concerns over the telephone. It is unclear precisely whether or how NRS benefitted financially from this change. On the one hand, NRS continued to receive its commission on all life insurance sales but reduced its sales costs. (Holland Dep. at 55:11–24.) In contrast, however, NRS now paid its sales team salaries plus bonuses. After the Saturn Program's implementation, NRS's sale of Monumental's life insurance once again decreased dramatically. In the fourteen weeks through the first week of April 2001, NRS sold an average of 92 new life insurance policies per week. In the ten weeks after April 24, NRS's sales fell to an average of 4.5 new applications per week, and less than one application per week in the final five weeks of that period. From that time to the present, according to Monumental, new sales of its life insurance have essentially ceased.

On September 28, 2000, Monumental filed this lawsuit alleging breach of contract and related claims. On October 1, 2001, the NACo agreement renewed automatically for a two-year term. On March 31, 2002, the USCM agreement renewed for another two-year term.

## II.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is

---

2. There appears to be either confusion or typographical errors concerning the starting date of the Saturn Program. The program was apparently announced in January, 2000. The Court assumes that the actual program commenced within a month, though some references say that NRS did not actually make the changes until January, 2001. Regardless, Monumental knew of the changes in 2000 because it filed suit then. The most detrimental effects were not felt until later in 2001.

entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Because the facts in the two periods are quite different and NRS has only moved for summary judgment on its liability for the 1998 restructuring, the Court follows NRS's proposed approach to consider its liability in two parts. The material facts during this period are not in dispute. Both sides agree that NRS changed its commission structure; the only question that remains is whether this action breached its legal obligations to Monumental.

## III.

■ The NACo and USCM agreements contain a number of related obligations, but the terms in those contracts are not altogether identical.[3] The Court considers the language in each contractual provision in turn, determining if NRS's actions could violate its contractual duties.[4] Also, although the Court considers each term separately, it must also consider the contract language as a whole.

## A.

Viewed broadly, the agreements at issue create promises of cooperation between NACo or USCM, NRS and Monumental. The promises are designed to benefit each party and to encourage success of their mutual interests. NACo and USCM wanted to offer their employees an opportunity to invest in a quality deferred compensation program. They wanted NRS to create, market and administer such a plan for their Member Counties and Cities. NRS agreed to do this in return for NACo and USCM endorsing and recommending NRS to their member organizations. NACo, USCM and NRS all believed that having a quality universal life insurance policy was essential to such a deferred compensation program. Monumental thus became part of the agreement as the exclusive life insurance provider to assure the other parties access to such quality policies. The Agreements appear structured so that any party could withdraw from the relationship without penalty at stated intervals should the arrangement no longer be beneficial. Having sketched the broad outlines of the parties' intent, the Court now considers the specific provisions in dispute.

■ Monumental first claims that NRS abridged the "best efforts" requirement in the NACo Agreement. That provision states in relevant part:

It is the intent of the Parties that the Policies be included in every Member County Plan to the exclusion of any other universal life or other interests sensitive life insurance product. NACo and [Nationwide] shall use their *best*

3. Although Monumental initially also cited the General Agent agreement as the basis for its complaint, in its Motion for Partial Summary Judgment, Monumental now contends that "[t]he two most important agreements in this litigation, and upon which Monumental now bases its claim for $24.6 million in damages, were the agreements with" NACo and USCM. The Court therefore primarily examines the relevant contractual provisions in those two contracts. The General Agent agreement is relevant to the more limited extent that it establishes a fiduciary relationship between the parties. The Court discusses this question in the section on Monumental's breach of fiduciary duty claim.

4. This is a contract dispute. In contract actions, the law of the state with the greatest interest in the outcome of the litigation should be applied. *See Breeding v. Massachusetts Indemnity and Life Insurance Co.*, 633 S.W.2d 717 (1982). In this case, the NACo Agreement is governed by the law of the District of Columbia and the USCM Agreement is governed by Ohio law. However, NRS notes that "Choice of law question as to applicable law regarding Monumental's contract and other claims are moot because ... there are no material differences between the law of Ohio, the District of Columbia or Kentucky for purposes of this motion." Def.'s Mot. for Partial Summ. J., at 6 n. 6. Monumental has not disputed this characterization.

*efforts* to accomplish this by, among other things:

> —Including the Policies as a deferral option in all Program marketing efforts for all Member Counties; and by
>
> —Encouraging all Member Counties to include the Policies in their Plans, plan descriptions and to adopt bid specifications permitting the inclusion of the policies as a deferral option to the exclusion of any other universal life or other interest sensitive life insurance product.

NACo Agreement at ¶ III(C).

Monumental contends NRS violated this provision when it reduced field agents' commissions for life insurance sales from 40 percent of first-year commissions to 25 percent as part of the 1998 restructuring. By decreasing the incentives for its sales force to sell Monumental's product to individual employees making their selections from "Member County Plans," Monumental argues, NRS abridged its "best efforts" obligation.

No one can deny that one of Monumental's goals was to sell life insurance policies and that the 1998 restructuring caused Monumental to lose individual insurance policy sales. However, the "best efforts" provision was not directed toward such a specific outcome or that particular intent. Rather, the "best efforts" obligation in the NACo contract was expressly directed to NRS's efforts to assure that Monumental's life insurance products were "included in every Member County Plan." This can be seen in the first sentence of the provision where the parties clearly expressed their intent that the Monumental "policies be included in every Member Plan." In the next sentence, the parties then promised their "best efforts" to accomplish "this."

Grammatically, the word "this" can only refer to the "intent" expressed in the immediately proceeding sentence. The two suggestions that follow support such an interpretation. Each relates directly to inclusion of Monumental policies as an option in the Member Plans, rather than efforts to sell insurance policies to individual plan participants.

A duty to *include* those life insurance products in its 457 plans as a choice for prospective employees, and a duty to *enroll* participants in Monumental's life insurance products once they are offered in those plans are entirely different obligations. The plain language of the contract expressly requires the former and makes no mention of the latter. Failing to do the latter, without some supporting contractual language, does not automatically implicate the former. The intent which the parties actually state in the contract is the only measure by which this Court can enforce agreements. Monumental has provided absolutely no evidence that prior to 2000 NRS failed to include its product in the Member County/City 457 plans.

Not surprisingly, Monumental focuses its arguments on the decrease of enrollees in its life insurance product. To be sure, as the Court has said, both NRS and Monumental were interested in selling insurance policies. The agreement was structured to provide for that and to give each a maximum opportunity and incentive to do so. However, the NACo agreement simply does not require NRS to use its best efforts to sell insurance policies to individual plan participants.[5] Even viewing the evidence in its most favorable light, Monumental's claims that NRS's 1998 restructuring violated the NACo "best efforts" clause cannot succeed as a matter of law. Therefore, Monumental's claim for

---

5. It is likely there were sound reasons for this. NACo and USCM wanted to offer their members and the participants a variety of investment opportunities within the deferred plan. It may not have wanted an agreement which promised promotion of specific products.

judgment as to that activity will be denied and NRS's motion for summary judgment will be sustained.

■ As to the 2001 Saturn Program, only Monumental has moved for summary judgment on its own claims. The same legal view applies to the "best efforts" contractual provision. Once again, that NRS may have changed its compensation plan and caused a significant reduction in life insurance sales does not directly implicate the "best efforts" clause. The parties dispute whether NRS's actions or inaction could have caused the omission of the universal life option from some Member Plans. The evidence may suggest that NRS no longer was concerned about selling insurance policies. All of this is disputed and the evidence is a long way from requiring summary judgment. The Court will be listening at trial to determine the extent to which evidence supports such claims.

### B.

■ The Court next considers the identical provisions in both the NACo and USCM agreements that require NRS "to promote [Monumental's] interests and those mutual interests of [NRS] and [Monumental] as contemplated by this Agreement." NACo Agreement, at ¶ VIII(H); USCM Agreement, at ¶ VIII(H). Monumental's "interests" can only mean its desire to sell insurance policies. What then does the contract require by this rather general provision? Based on the four corners of the contract, the Court concludes, with the equally general observation, that the parties intended that NRS promote Monumental's policies within the constraints of its own interests. The Court draws on two sources of authority in support of this conclusion.

■ First, when interpreting a contract on a motion for summary judgment, the "plain and ordinary meaning" doctrine is at the heart of contract construction. *Apponi v. Sunshine Biscuits, Inc.*, 652 F.2d 643, 647 (6th Cir.1981). Under this doctrine, "words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Id.* In this case, the contracting parties used the word "promote." Webster's Second University Dictionary defines promote to mean, "to attempt to sell or popularize by advertising." Webster's Second New Riverside University Dictionary 942 (1994). NRS, therefore, had a duty to *attempt to sell or popularize* Monumental's product, so long as that attempt was consistent with its own interests.

Second, the contract provision at issue also counsels the Court to look to what the parties in the agreements "contemplated" as their mutual interests. NACo Agreement, at ¶ VIII(H); USCM Agreement, at ¶ VIII(H). To determine what the parties as a practical matter envisioned, the Court has the benefit of the parties' expressed intent as stated at the outset in both the NACo and USCM agreements. In both cases, the NACo and USCM contracts' "recitals" state that PEBSCO was selected "to establish and administer a quality deferred compensation program pursuant to Internal Revenue Code Section 457 for the benefit of" NACo and USCM's subsidiary organizations. NACo and USCM Agreements at p. 1. Furthermore, the recitals also state that NACo and USCM "selected [Monumental's predecessors] to be the exclusive underwriters of its universal life policy for participation by Member Counties [or Cities] and their employees" and that Monumental also "agree[s] to make available to each Member County [or City] participating in the Program their universal life policy." *Id.* In effect, the parties to these agreements, including NACo and

USCM, signed on with the purpose of contractually obligating NRS to include Monumental's product as the exclusive life insurance option.

Thus, considering the provision as a whole, a jury would be asked whether NRS violated a contractual provision which required it to promote Monumental's policies consistent with the overall interest of maintaining a quality deferred compensation plan. In this case, NRS did just that by offering government employees the option to purchase life insurance and by having a commissioned sales force with an incentive to sell those products. Reducing the amount of the commissions does not change these basic facts. The Agreements do not, anywhere on their face, suggest the parties intended for NRS to aggressively market Monumental's life insurance nor do they require a specific quality of work force or promotion. The Agreements imply only that NRS would "make available" the life insurance option to participants. Based on the available uncontroverted evidence, the Court concludes NRS met that obligation by its conduct through the 1998 restructuring and up until the initiation of the Saturn Program.

■ On the other hand, NRS's conduct under the Saturn Program raises much more significant contractual concerns. One could conclude from the evidence that with the Saturn Program's inception, NRS did little to promote the policies or perhaps even to assure that they were included as part of the Member Plans. As a consequence, sales of insurance policies were virtually eliminated. NRS has some explanations that could persuade a reasonable jury that it promoted Monumental's interests consistent with its own. The Court cannot say that such a conclusion is so unlikely that it should enter judgment in favor of Monumental on the issue of liability.

## C.

The parties discuss other contract provisions at lesser length. The Court does not find that any of them support an actionable contract claim.

■ The NACo Agreement contains a provision in which NRS and NACo agree to encourage Member Counties to include life insurance as soon as possible, where it may have been precluded. NACo Agreement at ¶ III(E). In another provision, NRS agrees to "organize and maintain a force of agents to enroll Member County employees in the Plan ... [NRS] and [Monumental] agree to use their best efforts to license [NRS] agents to assist in the enrollment of Member County employees in the Plan." *Id.* at ¶¶ X(A), (B).

Each of these provisions seems peripheral to the primary allegations of the case. Moreover, once again, the language refers to including insurance in a Plan or enrolling employees generally in a Plan. Neither sets out a duty regarding sales of insurance.

In summary, the Court concludes that the 1998 restructuring did not breach the contract. NRS's conduct after January, 2000, raises questions which appear to require a jury resolution. Therefore, Monumental's motion for summary judgment as to the 1998 restructuring is denied and NRS's motion for summary judgment is sustained. As to the Saturn Program conduct, Monumental's motion for summary judgment is denied.

## IV.

■ The Court next considers the cross-motions of Monumental and NRS as to Count II, Monumental's claim for breach of fiduciary duty. In order to state a claim for breach of a fiduciary duty, Monumental must first show that a fiduciary duty exists. In this case, Monumental

asserts that NRS was its agent. Under Kentucky law, a fiduciary relationship is "founded on trust or confidence reposed by one person in the integrity and fidelity of another ... in which a duty is created in one person to act primarily for another's benefit in matters connected with [the] undertaking." *Steelvest, Inc. v. Scansteel Service Ctr.,* 807 S.W.2d 476, 485 (1991). In this case, such a manifestation was evidenced by the creation of the General Agent Agreement. NRS therefore was Monumental's fiduciary; the parties do not appear to dispute this fact.

■ Rather, they argue about the scope of NRS's fiduciary duty and whether that duty was breached. Section 13 of the Restatement (Second) of Agency (1958) defines the fiduciary duties arising out of an agency relationship: "An agent is a fiduciary with respect to matters within the scope of his agency." [6] Where a contract exists defining the scope of the principal-agent relationship, as is the case here, a limited agency relationship arises. *Fulcrum Financial Partners v. Meridian Leasing Corp.,* 230 F.3d 1004, 1012–13 (7th Cir.2000). In that more limited setting, the existence and extent of the agent's duties are determined by the agreement between the parties. *Restatement (Second) of Agency* (1958) § 376. Monumental is therefore correct in arguing that the duty of good faith and fair dealing that arise in an agency relationship were owed here.

■ However, Monumental's best fiduciary duty claim is that, by reducing the commissions, "NRS indisputably acted in its own interests and contrary to Monumental's interests." Pl.'s Resp. to Def's. Summ. J. Mot. at 24. This is simply a restatement of Monumental's contractual claim; specifically, that NRS violated its duties to Monumental by reducing the commissions. In this case, NRS was obligated to promote the inclusion of Monumental's product in NACo and USCM member entity plans. Any reduction in the commissions, again, goes to the duty to *sell* those plans to individual employees—a responsibility that goes beyond the scope of the agreement and thus the agency relationship. In this case, all four parties to the business arrangements that led to this dispute were sophisticated entities represented by counsel, and fully capable of negotiating complex agreements. There were no disparities in bargaining power and the contract was negotiated at arms length. *See Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1090 (1st Cir.1989).

Under these circumstances, the Court will not expand the scope of NRS's fiduciary duties beyond its contractual obligations. Monumental's motion for judgment on the 1998 restructuring conduct is denied and NRS's motion for summary judgment is sustained.

■ Once again, however, NRS's conduct under the Saturn Program raises important concerns. The evidence at this stage suggests that the Saturn Program's introduction may have not been done in good faith towards Monumental.[7] A rea-

---

6. The District of Columbia, Kentucky, and Ohio all look to the Restatement (Second) of Agency for guidance regarding the fiduciary obligations that apply to sophisticated contractual parties. *Glekas v. Boss & Phelps, Inc.,* 437 A.2d 584, 589 (D.C.App.1981); *Smith v. Isaacs,* 777 S.W.2d 912, 914 (Ky. 1989); *Orvets v. National City Bank, Northeast,* 131 Ohio App.3d 180, 722 N.E.2d 114, 119 (1999).

7. The Court notes at this time that the General Agent Agreement could give rise to fiduciary duties such as the duties of good faith and fair dealing which NRS may have breached during the Saturn Program. Although this issue is not ripe for consideration at the summary judgment phase, the Court may consider these duties at trial depending on the evidence offered at that time.

sonable jury, then, could infer that NRS violated its basic fiduciary duties as well as its contractual duties. Because a question of fact remains, Monumental's motion for summary judgment as to the Saturn Program is denied.

## V.

■■■■ NRS has also moved to dismiss Count III, Monumental's claim for tortious interference with a prospective business advantage in the period involving the 1998 restructuring. Thus far, the parties have only argued over whether such a claim is even permissible and chosen not to discuss the merits. NRS contends that "the damages Monumental seeks on this count are identical to the damages already sought on its contract claim." Def.'s Mot. for Summ. J. at 27–28. This is incorrect. As Monumental points out, the claim for tortious interference with a prospective business advantage allows a plaintiff to recover punitive damage for intentionally interfering between plaintiff and a third-party. See, e.g., CMI, Inc. v. Intoximeters, Inc., 918 F.Supp. 1068, 1080 (W.D.Ky. 1995); Wolf v. McCullough–Hyde Memorial Hospital, 67 Ohio App.3d 349, 586 N.E.2d 1204, 1208 (1990); Brown v. Carr, 503 A.2d 1241, 1247 (D.C.App.1986). In other words, Monumental is not allowed to recover double damages for the contract violation, but it may recover punitive damages for NRS's tortious actions, if it is able to prove each of the elements of its claim. Although the parties have not discussed the merits of this claim, NRS has moved

for summary judgment. Finding such a claim may, as a matter of law be made, the Court now turns to the merits.[8]

■■■■ Under Kentucky law, in order to recover under this cause of action, Monumental must plead and prove the following elements: (1) the existence of a valid business relationship or its expectancy; (2) defendant's knowledge thereof, (3) an intentional act of interference; (4) an improper motive; (5) causation; and (6) special damages. CMI, Inc. v. Intoximeters, Inc., 918 F.Supp. 1068, 1080 (W.D.Ky. 1995). Consistent with these elements, Monumental has thus far pled the existence of its business relationship with NACo and USCM, and NRS's knowledge therein.

Beyond these elements, however, Monumental has not set forth any facts other than those used to substantiate its breach of contract claim. Nor has it identified any evidence of a motive or intent by NRS to interfere with Monumental's policies being offered as an option in Member Plans. It does say that NRS altered the commission structure for its own financial gain. But Monumental's argument misses the point. Here, NRS had its own business relationship with NACo and USCM to uphold. To find NRS's actions in maintaining that relationship, while continuing to promote Monumental's product to NACo and USCM, somehow amounted to tortious interference does not rise to the level of intent and purpose needed to establish this claim. See National Collegiate Athletic

---

**8.** This Court, sitting in diversity, must apply Kentucky law, including Kentucky's choice of law rules. Menuskin v. Williams, 145 F.3d 755, 761 (6th Cir.1998). Under Kentucky law governing conflict of laws problems in tort actions, any significant contact with Kentucky is sufficient to allow Kentucky law to be applied. McGinnis v. Taitano, 3 F.Supp.2d 767, 769 (W.D.Ky.1998) (citing Bonnlander v. Leader National Insurance Co., 949 S.W.2d 618, 620 (Ky.App.1996)). As this Court noted in its May 17, 2001 Memorandum and Order denying change of venue, some of the wrongs alleged and the consequences of them occurred in Kentucky. Furthermore, Monumental claims that its losses were suffered in the state of Kentucky. The Court, therefore, applies Kentucky law to analyze the tort at issue.

*Assoc. v. Hornung,* 754 S.W.2d 855, 857–860 (Ky.1988) (noting that even if a party does show an intent to interfere that right may be overcome by showing the defendant had a good faith basis to protect its own contractually bargained for interests).

Based on the evidence established at this time, the Court concludes Monumental has not pled sufficient facts related to NRS's 1998 restructuring sufficient to overcome NRS's motion for summary judgment. NRS's motion for summary judgment as to the 1998 restructuring is sustained.

## VI.

Last, NRS has moved to dismiss Count IV, Monumental's Promissory Estoppel claim. As a starting point, the parties appear to agree that Kentucky courts have adopted the promissory estoppel doctrine as stated in the Restatement (Second) of Contracts § 90 (1965):

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*McCarthy v. Louisville Cartage Co.,* 796 S.W.2d 10, 11 (Ky.Ct.App.1990) (citing *Meade Const. Co. v. Mansfield Commercial Elec.,* 579 S.W.2d 105, 106 (Ky.1979)). In their assessments as to whether this claim should lie, however, the parties diverge.

■ Monumental has pled promissory estoppel in the alternative to its claims under the contract. NRS argues that the doctrine cannot lie because it is no more than a redressed version of Monumental's contract law claims. In this regard, NRS is correct. Promissory estoppel "cannot be the basis for a claim if it represents the same performance contemplated under a written contract." *Tractor & Farm Sup-*

*ply v. Ford New Holland,* 898 F.Supp. 1198, 1205 (W.D.Ky.1995). For the purposes of analyzing the contractual agreements in this case, the Court assumed the parties had an enforceable agreement through which NRS agreed to promote Monumental's product, as Monumental now alleges. However, the Court did not assume that NRS made a promise to sell Monumental's product. Accordingly, viewing the facts in a light most favorable to Monumental, the Court will consider Monumental's alternative promissory estoppel claim as if no contract existed. *See FS Invs., Inc. v. Asset Guar. Ins. Co.,* 196 F.Supp.2d 491, 507 (E.D.Ky.2002). This Court must therefore determine whether Monumental has set forth a prima facie case of promissory estoppel.

■ To state a claim for promissory estoppel, Monumental must show that NRS promised to sell its life insurance product and that Monumental in fact relied on this promise to its detriment. *See Gray v. Jackson Purchase Prod. Credit,* 691 S.W.2d 904, 906 (Ky.Ct.App.1985). In support of its promissory estoppel claim, Monumental summarily relies on its arguments in favor of a contract that would support an identical claim. Examining the evidence produced thus far, Monumental cannot establish a prima facie case of promissory estoppel. Other than the contract and Monumental's expectations accompanying it, Monumental has offered *no* evidence that NRS separately promised to sell its life insurance product. *See McCarthy,* 796 S.W.2d at 12–13 *(citing Lynch v. Dawson Collieries, Inc.,* 485 S.W.2d 494, 496 (Ky.1972) for the proposition that estoppel is inappropriate where there is "no evidence of a promise nor any evidence of reliance that could be expected or even justified under the facts").

The Court will grant NRS's motion for summary judgment on Monumental's al-

ternative promissory estoppel claim for its actions prior to the Saturn Program's implementation.

## VII.

■ NRS has asserted four counterclaims against Monumental. NRS's counterclaims mirror those of Monumental and sound in contract, tortious interference, breach of fiduciary duty and breach of good faith. The factual underpinning for each is the same. NRS alleges that Monumental has contacted NRS's competitors in a manner detrimental to NRS's interests.

In the General Agent Agreement, Monumental appointed NRS as its agent to sell and deliver certain types of insurance policies to participants in government controlled deferred compensation plans. The NACo and USCM agreements also make NRS the exclusive agent for Monumental. Those agreements prohibit Monumental from selling insurance products to any persons covered by those agreements and prohibit Monumental from communicating directly with plan participants unless required to do so by law.

Over time, a number of city and county Member Plans in both NACo and USCM have terminated NRS as the administrator of their deferred compensation plans. In each of those Member Plans, some of the participants had purchased Monumental insurance policies. After NRS was terminated as administrator of those plans, Monumental contacted the new plan administrators and their own policyholders on issues related to the insurance policies. NRS has no evidence that Monumental was selling policies through a new 457 plan or through competitors of NRS. Monumental has continued to pay all commissions owed to NRS on all policies, even though NRS is no longer administering them. Monumental says that it made no contact until after NRS was replaced as plan administrator in each case. From the

evidence NRS submitted, that also appears to be the case.

The Court concludes that Monumental does not violate any of its contractual or other obligations to NRS by communicating with policyholders and new plan administrators after NRS was terminated as plan administrator. Under those circumstances, the various contracts did not prohibit such contact. Nor did such contact either cause a termination of NRS's business relationship or cause it damage. Therefore, Monumental did not interfere with a business relationship. *See CMI, Inc. v. Intoximeters, Inc., supra,* and *Brookeside Ambulance Inc. v. Walker Ambulance Serv. Inc.,* 112 Ohio App.3d 150, 678 N.E.2d 248, 252 (1996). Similarly, assuming that Monumental continued to pay commissions due and only made contact after NRS was terminated as a plan administrator, the Court can find no violation of any fiduciary duty or any duty of good faith.

Therefore, the Court is inclined to dismiss each of the NRS counterclaims. The Court hesitates only because it is unsure from the record as to the exact timing of Monumental's contact with policyholders and new plan administrators. Unless NRS can show evidence from which a reasonable jury could find that Monumental contacted prohibited persons prior to NRS's termination as plan administrator, each of the counterclaims will be dismissed at trial.

## VIII.

NRS raises several final issues that could be crucial to this case. It argues that Monumental's damages must be limited due to the doctrines of mitigation or waiver. NRS wants to limit Monumental's alleged damages because it failed to exercise its right to terminate the NACo Agreement before its October 1, 2001 re-

newal and the USCM Agreement before its March 31, 2002 renewal. As it turns out, the application of each doctrine is quite similar. Their application to these particular facts requires careful analysis.

Each of the Agreements contain identical termination provisions. These provisions are key to understanding the relationship devised and intended by the parties. The initial term of each agreement was five years. Thereafter, the agreements were automatically renewed for two year terms. Either party could terminate for cause at any time. Moreover, either party could terminate without cause on ninety (90) days' notice prior to the next renewal date. Upon such termination, NRS would be free to offer other life insurance policies in a Member Plan; Monumental would be free to work with any other competing plan administrator to include its insurance policies within other organization or individual 457 plans. With these facts in mind, the Court now considers the mitigation and waiver issue.

As the starting point for both its mitigation and waiver arguments, NRS argues that Monumental chose to renew the agreements and that this decision, because it was made *with knowledge of the breach,* equates to a failure to mitigate as well as a waiver as to damages after the renewal period.[9] Although legally distinct, the operation of the two doctrines in this case turns out to be analytically the same.

■■■■ Under the well-established rule of mitigation, an injured plaintiff has a duty to limit its damages. *Baker v. Baltimore & Ohio R.R. Co.,* 502 F.2d 638, 644 (6th Cir.1974); *Federal Materials Co. v. Paducah Bank & Trust Co.,* 1989 Ky.App. LEXIS 6, *18 (Ky.App.1989). That duty re-

quires one to avoid future damages if that is possible with reasonable effort and without undue expense. *Chandler v. General Motors Acceptance Corp.,* 68 Ohio App.2d 30, 426 N.E.2d 521 (1980); *Civil Service Board v. Fehler,* 578 S.W.2d 254, 259 (Ky. App.1978). The purpose behind this rule is clear: a party claiming damages resulting from someone else's wrongful conduct must take responsible advantage of opportunities to reduce or minimize losses once they know they are being damaged, *FDIC v. Wheat,* 970 F.2d 124, 132 (5th Cir.1992), otherwise, its actions are intentionally wasteful. *Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1427 (7th Cir.1986).

■■■■ The common definition of a waiver is "the intentional relinquishment of a known right." *Howard v. Motorists Mut. Ins. Co.,* 955 S.W.2d 525 (Ky.1997); *see also The White Co. v. The Canton Transportation Co.,* 131 Ohio St. 190, 2 N.E.2d 501 (1936). In essence, when a defendant argues waiver, it contends that the plaintiff acted with advance knowledge of any legal detriments it might suffer; it therefore agreed to assume the risk of those detriments in hopes of receiving an offsetting benefit and cannot now recover for losses it anticipated. As a practical matter, then, demonstrating a waiver requires proof that the plaintiff knew what losses it risked incurring. Although a waiver is consensual in nature, a waiver may be inferred from conduct, even if the conduct is inconsistent with the assertion of that right. *FS Invs., Inc. v. Asset Guar. Ins. Co.,* 196 F.Supp.2d 491, 505 (E.D.Ky.2002).

■■■■ As a practical matter then, the prerequisite to triggering either doctrine is NRS's ability to prove that Monumental

---

**9.** The Court briefly notes that, with regard to the period after Monumental supposedly knew about the breaches, NRS has not al-

leged any affirmative defenses. The Court, therefore, begins its analysis with the renewal dates.

knew about NRS's breach and its own. Since Monumental filed suit in September, 2000, its knowledge of each would appear indisputable. As a preliminary matter, the Court must clarify the nature of those potential damages which NRS argues should have been mitigated or which are waived. Monumental may be damaged in two related ways from the alleged breach: (1) the reduction of premium income from NRS's sale of new insurance policies, and (2) the reduction of income due to its prohibition from doing business with other 457 plans and competitors of NRS. Now the Court must determine whether, under either theory, Monumental has a duty to do something to lessen its damages.

A waiver is "the intentional relinquishment of a known right." By filing a federal lawsuit, Monumental asserted its right to full performance of the contract. By doing so, it put NRS on notice of its rights and its intention to assert them. By not terminating and allowing renewal, Monumental essentially told NRS that it wanted continued performance on its terms. Therefore, Monumental did not relinquish any of its contractual rights. Indeed, after receiving notice of the federal lawsuit, NRS itself could have cut off its own damages by terminating without cause.

The mitigation analysis is similar, though it concerns Monumental's obligation to terminate the contract for cause and pursue contracts which lessen the damages caused by NRS's breach. Actually, NRS seems to argue that by not renewing the contract, Monumental's losses would stop. However, terminating the contract only ends NRS's legal obligation of performance. The doctrine of mitigation does not require Monumental to cut off its own legal rights to contract performance.

The Court finds only one potential basis for proving failure to mitigate. Monumental knew that it might mitigate its potential losses, by terminating the contract for cause and by selling its insurance products through competitors of NRS. NRS has the burden of proving that such a strategy was possible and that Monumental could have actually reduced its damages in this manner. This will be a most difficult burden to meet, though the Court is not prepared to say that NRS cannot attempt it. All other aspects of the waiver and mitigation defenses are unavailable as a matter of law.

In summary, then, the Court concludes that it will be a question for the jury to determine whether Monumental could have mitigated its damages as described here. Regardless, Monumental may still collect damages on the period up to the renewal dates and it may collect damages beyond the renewal dates for those injuries which began prior to it. It will, again, be a question for the jury as to the amount of damages Monumental occurred in that earlier period.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

The Court has considered the parties cross motions for summary judgment on various claims. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that NRS's Partial Motion for Summary Judgment is SUSTAINED and the Court DISMISSES WITH PREJUDICE Counts I, II, III, and IV as to conduct prior to January, 2000.

IT IS FURTHER ORDERED that Monumental's Motion for Partial Summary Judgment as to liability on Counts I and II is DENIED.

IT IS FURTHER ORDERED that Monumental's Motion for Summary Judgment as to NRS's counterclaims is DE-

NIED at this time, subject to NRS clarifying its proof.

IT IS FURTHER ORDERED that the Court will instruct the jury regarding mitigation consistent with this Memorandum Opinion.