NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0904n.06

**No. 10-5454**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ALLIANT TAX CREDIT FUND 31-A, LTD.; ALLIANT TAX CREDIT 31, INC.; ALLIANT TAX CREDIT FUND XXVII, LTD.; ALLIANT TAX CREDIT XXVII, INC.; ALLIANT TAX CREDIT XI, LTD; ALLIANT TAX CREDIT XI, INC., | ) ) ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) ) | FILED<br>**Aug 15, 2012**<br>LEONARD GREEN, Clerk<br><br>On Appeal from the United States District Court for the Eastern District of Kentucky |
| v. | ) ) | |
| M. VINCENT MURPHY, III, | ) ) ) | |
| Defendant-Appellant. | ) | |

Before:     BOGGS, SUHRHEINRICH, and COOK, Circuit Judges.

        BOGGS, Circuit Judge.  This is an appeal of a breach-of-contract suit in which the plaintiffs sought to recover their capital investment from the general contractors, two individual guarantors, and one corporate guarantor, for low-income housing units that were never completed. Default judgment was entered against the general contractors and the corporate guarantor when they failed to appear.  The plaintiffs then prevailed on summary judgment against the individual guarantors, and the district court awarded them $8,946,643 in liquidated and rescission damages. Only one of the individual guarantors has appealed.  Because we find no fault with the district court's analysis, its decision is affirmed.

I

The six plaintiffs, Alliant Tax Credit Fund 31-A, Ltd.; Alliant Tax Credit 31, Inc.; Alliant Tax Credit Fund XXVII, Ltd.; Alliant Tax Credit XXVII, Inc.; Alliant Tax Credit XI, Ltd.; and Alliant Tax Credit XI, Inc. [collectively, "Alliant"], are corporations that were formed to construct and lease six low-income apartment buildings for senior citizens. The plaintiffs executed six agreements, one for each property, to complete the projects with six "General Partners."[1] These Agreements were called the "Limited Partnership (LP) Agreements." Each LP Agreement was guaranteed by its own "Guaranty Agreement." M. Vincent Murphy, Robert McMaster, and Ironwood Development, LLC, were the guarantors. Under the LP Agreements, Alliant provided the initial capital for the buildings and would receive certain tax benefits. The General Partners bore responsibility for the construction and initial management of the units, and would receive proceeds when the buildings were sold or refinanced. The Guaranty Agreements guaranteed the General Partners' obligations under the LP Agreements.

---

[1]The General Partners were: (1) Nicholasville Community Housing, LLC; (2) Jessamine Community Housing, LLC; (3) Princeton Community Housing, LLC; (4) Bowling Green Community Housing, LLC; (5) Warren County Community Housing, LLC; and (6) Hopkinsville Community Housing, LLC. Alliant named these General Partners as defendants in the underlying suit. Default judgment was entered against them, and they are not party to this appeal.

*A. The Limited Partnership (LP) Agreements*

Under the LP agreements, the General Partners were required to construct the housing projects by an agreed-upon completion date and to lease them.[2] Specifically, the General Partners were to "cause Rental Achievement" by September 30, 2005. "Rental Achievement" was defined as follows:

> [T]he date that all of the following conditions have been fulfilled: (I) the Conversion Date [the date on which the "Permanent Loan" converted from "an interest only construction loan to an amortizing term loan" according to terms defined in the parties' Construction Loan Agreement] shall have occurred; (ii) all governmental approvals necessary for legal occupancy of all units . . . have been obtained; and (iii) ninety percent (90%) [o]ccupancy of the [a]partment [c]omplex has occurred during each of three consecutive months . . . .

The General Partners were also required to pay off all loans and liens on the properties. In return, the GPs would receive 80% of the net proceeds when the projects were re-financed or sold.

The parties provided for two types of damages in the event of a breach of contract: Development Deficits and rescission damages. Development Deficits were defined as the any amount beyond the sum of: "the proceeds of the Permanent Loan, operating income of the Apartment Complex . . ., that portion . . . of the Investor Limited Partner Contribution payable at or prior to the Conversion Date and . . . the proceeds of the Bridge Loan . . ." that would be required to complete

---

[2] Alliant, as the limited partner, agreed not to participate in the management or control of the business of the partnership. Alliant's agreement not to be involved in the management or control is consistent with the role of a limited partner under Kentucky law, which states that a limited partner does not have the right to bind the partnership. KEN. REV. STAT. (K.R.S.) § 362.2-302. In exchange, limited partners are relieved of personal liability on partnership obligations. K.R.S. § 362.2-303.

the construction, pay off the "bridge loan," and pay partnership expenses up to that date. The General

Partners were responsible for any Development Deficits on the project.

Rescission damages were defined as the return of Alliant's capital contribution, with interest

at a rate of the "greater of twelve percent (12%) per annum or the Interest Rate[3] from the respective

dates on which the various installments of the contributions were made." Alliant could elect

rescission for a number of reasons: if the project was not completed on time; the General Partners

defaulted on the Permanent Loan or the Bridge Loan, so that the loan was accelerated or foreclosed

on; or if Rental Achievement was not reached by September 30, 2005.

*B. The Guaranty Agreements*

Also part of the contracts between the parties were Guaranty Agreements executed for each

of the six low-income housing units. The agreements were identical except in the name of the

property implicated. Each one guaranteed certain obligations of the General Partner under "the

Agreement," where "the Agreement" was defined as the "Amended and Restated Agreement of

Limited Partnership dated as of December 8, 2003." The parties do not dispute that "the Agreement"

referred to was the relevant LP Agreement for each property.

The Guaranty Agreements guaranteed the due, prompt, and complete performance of the

General Partners' obligations, including the obligation of each to pay Development Deficits or

---

[3]"Interest Rate" was defined as "a rate per annum (compounded annually on December 31 of each calendar year) equal to two percent (2%) over the Prime Rate, but in no event more than the maximum rate of interest permitted by law."

rescission damages. They also guaranteed the General Partners' obligation to cause Rental Achievement. The Guaranty Agreements cross-referenced the LP Agreements extensively, providing, for example:

> 1. Each Guarantor irrevocably and unconditionally fully guarantees the due, prompt and complete performance of each and every one of the following obligations under the following provisions of the [LP] Agreement:
>> (i)the obligation to effectuate Completion . . . in accordance with the section 5.9A;
>> (ii) the obligations under Section 7.4 in the event of a rescission pursuant to Section 7.4(a)(ii);
>> (iii) the obligation to pay all Development Deficits under Section 5.9B;
>> . . .
>> (vi) the obligation to cause Rental Achievement in accordance with the requirements of Section 5.9D . . . .

### C. Breach of Contract

Unfortunately, both the General Partners and the Guarantors failed to live up to their agreements in this case. The General Partners failed to make the required loan payments, causing the bank to foreclose on all of the apartment buildings in April 2007. The parties do not dispute that there were unpaid liens on all of the buildings after the deadline for constructing, renting, and paying off the loans had passed. In fact, the General Partners had even failed to complete construction on one of the units. At the time Alliant sued, there were past-due balances of $10 million on the LP's loans from Bank of America. As a result, Alliant sued the General Partners and the Guarantors, charging the General Partners with breach of the LP Agreements and the Guarantors with breach of the Guarantor Agreements.

II

On November 20, 2007, Alliant filed its complaint against the General Partners and the Gurantors in the United States District Court for the Eastern District of Kentucky.[4] Alliant claimed that the General Partners breached the terms of the LP Agreements and mismanaged the projects by "causing, failing to avoid, and failing to pay all of the 'Development Deficits,'" and by failing to "cause 'Rental Achievement.'" Alliant also alleged that the Guarantors had breached the Guarantee Agreements. Alliant asked for a judgment against the General Partners and the Guarantors awarding Alliant damages, costs, expenses, prejudgment interest, incidental damages and consequential damages for the breach of the LP Agreements and the Guaranty Agreements, respectively.

On January 18, 2008, the clerk for the Eastern District of Kentucky entered a default judgment against the six General Partners after they failed to file answers within the time allotted by FED. R. CIV. P. 12(a)(1)(A). This judgment was not appealed. On February 6, 2008, default judgment was entered against defendant-guarantor Ironwood Partners, LLC, for the same reason. This judgment was also not appealed.

On January 22, 2008, defendant-guarantor Murphy, after having received two extensions of time, filed his answer. He argued that Alliant's claims were barred by K.R.S. § 271B.15-020 (since repealed) because the guaranty agreement was unenforceable. He also argued that Alliant had failed to mitigate damages.

---

[4] The district court had diversity jurisdiction over the case. 28 U.S.C. § 1332(a)(1). The parties do not dispute that Kentucky law governed their claims, all of which were based on state law.

On June 10, 2009, Alliant moved for summary judgment against Murphy and McMaster. Murphy moved for, and was granted, three extensions of time to respond. The order granting the last extension of time allowed Murphy until August 3, 2009, to file his response. It also stated, in bold type in the order and on the docket entry, that no further extensions would be granted.

On August 3, 2009, Murphy nevertheless moved for another extension of time to file his response. He stated that he had not received transcripts from a March 29 deposition of Brian Doran, Alliant's representative who testified as to damages, until July 28, and that he deserved more time because Alliant had alleged a new theory of rescission damages in the deposition. The court docket also showed Murphy's response to Alliant's motion for summary judgment as filed on August 3, however.[5] He also filed a cross-motion for summary judgment, arguing that Alliant lacked capacity to bring the suit under K.R.S. § 271B.15-020(3), which requires "foreign" corporations to obtain a certificate of authority to bring a lawsuit in Kentucky.

On August 26, the district court denied Murphy's motion for another extension of time. The court noted that in fact Alliant had requested rescission damages in its motion for summary judgment, and that Murphy had therefore had almost a month to respond. The court further took judicial notice of the fact that delays in obtaining deposition transcripts are common and should be anticipated. It also noted that it had given Murphy clear warning that it would grant no further extensions.

---

[5]It is not clear whether Murphy's response and his request for an extension of time were filed simultaneously, which would seem contradictory, or if his response was submitted after the court denied his request for an extension.

On September 30, 2009, the district court issued an order granting Alliant's motion for summary judgment on liability against Murphy and McMaster. The order also denied Murphy's motion for summary judgment on Alliant's lack of capacity to bring suit, determining that Murphy had waived this defense. The court did not decide the issue of damages. It stated that the damages issues were "complex" and "require[d] further analysis," and that it would address damages in a subsequent opinion.

Murphy then moved for the court to alter its order granting summary judgment to Alliant, arguing that the court erred when it stated that Murphy had waived his defense that Alliant lacked capacity to bring the suit under K.R.S. § 271B.15-020(3). Murphy argued that he had raised the defense in his answer to Alliant's complaint, and this satisfied the requirement that a party raise this defense "at the earliest opportunity." *Alliant Tax Credit Fund 31-A, Ltd. v. Nicholasville Cmty. Hous., LLC*, 663 F. Supp. 2d 575, 584 (E.D. Ky. 2009) (citing *Abbott v. S. Subaru Star, Inc.*, 574 S.W.2d 684, 688 (Ky. App. 1978) ("The failure of a plaintiff to obtain a certificate [of authority], if required, is a defense which will be considered waived unless raised by the defendant at the earliest opportunity.")).

The district court denied the motion. The court agreed that Murphy had raised the defense in his answer, but stated that Murphy had never "affirmatively brought this defense to the court's attention through a motion to dismiss Plaintiff's Complaint." The court surmised that Murphy may have been "'laying [sic] under the log'" in choosing not to bring such a motion, because the remedy for failure to obtain a certificate of authority is merely for the plaintiff to obtain one before the final

judgment is entered. Using K.R.S. § 271B.15-020(3) as a defense to summary judgment, the court stated, on "the eve of trial," was not sufficiently prompt. Further, the court expressed doubt that Alliant"transact[ed] business" in the state of Kentucky within the meaning of the statute, and therefore stated that it probably was not required to obtain a certificate of authority.

On January 21, 2010, Alliant filed a brief on damages, providing methodologies for calculating Development Deficit and rescission damages, an affidavit from its representative Brian Doran, and a three-page exhibit of costs. Murphy filed a motion alleging: (1) that it was "not fair" to consider Alliant's rescission-damages theory because Alliant "deterred Murphy from taking discovery on this issue;" (2) that rescission damages were not available as a matter of law because "the General Partner has been removed;" and (3) fact questions existed as to whether Alliant had waived its right to seek rescission damages.

The district court held an evidentiary hearing on damages. Murphy did not contest that Alliant was owed Developmental Deficit damages, but claimed at the evidentiary hearing that he had been "ambushed by this rescission issue." He argued that when Alliant filed suit, the substantive allegations were insubstantial, and that he had no way of knowing what damages Alliant sought. For "the better part of eight months," Murphy claimed, he wondered, "'What are they asking for? What are their damages?'" Therefore, he argued, he did not expect Alliant to make a claim for rescission damages until they raised the issue in their summary-judgment motion.

Murphy argued that rescission damages were inappropriate because Alliant had initially tried to take over at the Renaissance property—"[t]hey removed us as general partner, tried to make a go

of it for a number of years, recalculated the tax credits . . . [a]nd then finally they threw up their hands." He claimed that Alliant did not make the decision to seek rescission—as opposed to Developmental Deficits—until years after they took control of the property.

On March 22, 2010, the court granted Alliant's motion for summary judgment on damages, awarding Alliant their full claimed damages of $8,946,643. The court granted Alliant Development Deficit damages of $1,874,513 for the five projects that defendants had completed and $7,072,130 in rescission damages for the incomplete Renaissance project. Regarding the Developmental Deficit damages, the court determined that Murphy had failed to "set forth specific objections to the Plaintiffs' . . . calculation." As to rescission damages, the court noted that McMaster pointed to nothing in the LP Agreement putting a time limit on Alliant's election of rescission damages. It also determined that the LP Agreement contemplated rescission and that the Guarantors should therefore have not been surprised when such damages were requested and should have conducted discovery on the issue. The court determined that the Guarantors did "not present sufficient evidence to raise a genuine question of material fact" regarding whether Alliant should have mitigated damages. The court stated that while the mitigation question "may often present a fact issue," that the "[d]efendants have presented no evidence as to the reasonable actions that the Plaintiffs should have taken."

Murphy filed this timely appeal.[6]

III

---

[6] McMasters chose not to appeal the district court's judgment.

On appeal, Murphy raises six arguments that collapse into four. He claims that Alliant lacked capacity to bring the suit against him, the guaranty agreement was unenforceable, the district court should not have allowed Alliant to claim rescission damages, and the district court improperly shifted the burden of proof to Murphy on summary judgment on damages. These arguments are dealt with in turn.

1

First, Murphy argues that Alliant's claims are barred by K.R.S. § 271B.15-020. Though it was repealed in April 2010, the parties do not dispute that it was in force when Alliant's summary judgment motion was pending. The statute provided that "a foreign corporation transacting business in [Kentucky] without a certificate of authority shall not maintain a proceeding in any court in this state until it obtains a certificate of authority." *Ibid.*

The district court held that Murphy waived any defense under K.R.S. § 271B.15-020 because he did not raise it until his response to Alliant's summary-judgment motion. Kentucky case law requires that a defense based on K.R.S. § 271B.15-020 must be raised "at the earliest opportunity." *Abbott*, 574 S.W.2d at 688.

In response, Murphy filed a motion to alter the judgment under FED. R. CIV. P. 59(e), in which he pointed out that he had raised the defense of K.R.S. § 271B.15-020 in his answer to Alliant's complaint. He argued that the court was thus incorrect when it determined he had not raised the defense at the earliest opportunity.

The court agreed that Murphy raised the defense in his answer, but nonetheless denied Murphy's Rule 59(e) motion. The court stated that "Murphy never *affirmatively* brought this defense to the court's attention through a motion to dismiss Plaintiff's Complaint." (emphasis added). It surmised that Murphy may have been "'laying under the log' on the issue of capacity, since the remedy is 'for Plaintiffs to register with the Secretary of State before a final judgment [is] entered.'" (citing K.R.S. § 271B.15-020(3)). The court stated that even if Alliant was in violation of the statute, the remedy was merely to stay trial until it obtained the certificate. Alternatively, the court determined that Alliant did not "transact business" in Kentucky, within the meaning of K.R.S. § 271B.15-020, because it was merely a Limited Partner, and that it therefore was not required to obtain a certificate of authority.

A district court may only grant a Rule 59(e) motion to alter or amend the judgment if there has been "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 496 (6th Cir. 2006). We review a district court's decision to grant or deny a motion to alter or amend judgment under Rule 59(e) for an abuse of discretion. *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 328 (6th Cir. 2011).

Murphy does not point to any law holding that the district court abused its discretion when it determined that he waived his § 271B.15-020 defense or that Alliant, as an LP, did not "transact business" in Kentucky under the terms of the statute. However, we need not address these issues. Even if the district court erred in its determination that Murphy waived the defense or Alliant did not

transact business under the statute, it was harmless error. It was not an abuse of discretion for the district court to read K.R.S. § 271B.15-020 as stating that the remedy for a failing to obtain a certificate of authority is to stay the proceedings while one is obtained.[7] Because the remedy for a is merely for the party to obtain a certificate of authority while the proceedings are stayed, Murphy's argument does not affect the outcome of the case. The district court's denial of Murphy's 59(e) motion was not an abuse of discretion.

2

Second, Murphy argues that the Guaranty Agreements were unenforceable because they failed to satisfy the K.R.S. § 371.065(1), which is aimed at protecting guarantors from being liable for an unknown obligation. The provision states:

> No guaranty of indebtedness which either is not written on, *or does not expressly refer to, the instrument or instruments being guaranteed* shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates.

---

[7]Though there has not been a Kentucky ruling specifically on this point, other jurisdictions have construed similar provisions in this way. *See Charles W. Smith & Sons Excavating, Inc. v. Lichtefeld-Massaro, Inc.*, 477 N.E.2d 308, 310 (Ind. Ct. App. 1985) (holding that "the failure of a plaintiff foreign corporation to obtain a Certificate [of Admission] by the date of the filing of its complaint in Indiana courts merely suspends rather than bars further legal proceedings until such time as the Certificate is obtained."); *Tri-Terminal Corp. v. CITC Indus., Inc.*, 432 N.Y.S.2d 184, 185 (N.Y. App. Div. 1980) (holding that "the more appropriate remedy," rather than dismissal of the complaint, was "a conditional dismissal or a stay affording plaintiff an opportunity to cure this non-jurisdictional defect.").

K.R.S. § 371.065(1) (emphasis added). The statute provides three ways a guaranty can be enforceable: (1) if it is written on the instrument it guarantees; (2) if it expressly refers to the instrument it guarantees; (3) if it is in writing, signed by the guarantor, and specifies his aggregate liability. In this case, the Guarantor Agreements undisputedly are not written on the instruments being guaranteed. Nor do they state the aggregate liability of Murphy, the guarantor. The district court held that the Guaranty Agreements nevertheless satisfy K.R.S. § 371.065 because they "expressly refer to" the instruments being guaranteed, the LP Agreements. Murphy claims that in fact the Guaranty Agreements fail to refer to these instruments expressly.

We review the district court's interpretation of the statute and the contracts de novo. *United States v. Parrett*, 530 F.3d 422, 429 (6th Cir. 2008); *Royal Ins. Co. of America v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008).

Murphy argues that the Guaranty Agreements make reference to "yet another set of 'Instruments'"—some of which are attached to the Guaranty Agreement, and that these are necessary to determine the full extent of Murphy's indebtedness. However, he argues, these instruments are not expressly referred to, and, further, they are not complete, because there are blanks in the agreement that have not been filled in. Thus, Murphy argues, because "[the instruments] are incomplete, the extent of the Indebtedness cannot be determined [and] the Guaranty does not 'expressly refer' to the 'instruments' to be guaranteed."

Contrary to Murphy's argument, the Guaranty Agreements explicitly "guarantee . . . obligations of the General Partner under the Agreement," where the "Agreement" is defined as the

"Amended and Restated Agreement of Limited Partnership dated as of December 8, 2003." The parties do not dispute that this refers to the LP Agreements. Therefore, the Guaranty Agreements "expressly referred" to the instrument they guaranteed. Furthermore, the Guaranty Agreements referred to specific provisions in the LP Agreements—for example, that the Guarantor agreed to "the obligations under Section 7.4 in the event of a rescission pursuant to Section 7.4(a)(ii) [of the LP Agreement]." Murphy cites no legal authority for his argument that the LP Agreement being incomplete would mean that the Guaranty Agreement fails to satisfy K.R.S. § 371.065. According to the plain terms of the statute, the fact that the Guaranty Agreement "expressly refers to" the LP Agreement is sufficient; the Guaranty Agreement would only be required to state the Guarantors "aggregate liability" if it *did not* expressly refer to the LP Agreement and was not written on the LP Agreement. *Smith v. Bethlehem Sand & Gravel Co., LLC*, 342 S.W.3d 288, 293 (Ky. App. 2011). The Guaranty Agreements plainly satisfy K.R.S. § 371.065.

3

Murphy's third argument is that the district court erred when it denied his Rule 56(f) motion for additional time to respond to Alliant's summary-judgment motion. FED. R. CIV. P. 56 (providing that "[a]fter giving notice *and a reasonable time to respond*," the court may dispose of a motion for summary judgment in one of several ways). Murphy argues that, by denying his fourth motion for more time, the court failed to give him a reasonable time to respond to Alliant's summary-judgment motion because he, "through no fault of his own, did not receive deposition transcripts . . . until July 28, 2009, only three (3) business days before his response . . . was due."

We review a district court's decision whether to grant a Rule 56(f) motion for an abuse of discretion. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 419 (6th Cir. 2008). Relevant factors in determining whether a district court abused its discretion include, "(1) when the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests." *Id.* at 420. Even when there has been *insufficient* time for discovery, the denial of a Rule 56(f) motion has been upheld if "further discovery would not have changed the legal and factual deficiencies." *Ibid.* (citing *Maki v. Laakko*, 88 F.3d 361, 367 (6th Cir. 1996)) (emphasis added) (internal quotation marks removed).

Murphy does not dispute that the district court granted him three extensions of time to respond to Alliant's June 10, 2009, motion, before denying his request for a fourth, nor that the district court specifically stated, in its third extension: "No Further Extensions Will Be Granted." Murphy asks us to equate his case with others in which we held it an abuse of discretion for a court to deny a Rule 56(f) motion when the moving party "was denied the right to conduct discovery." *See White's Landing Fisheries v. Bucholzer*, 29 F.3d 229, 231 (6th Cir. 1994). However, in *Bucholzer* the affected party received *no* discovery. *See id.* at 232 ("The . . . grant of summary judgment . . . was therefore issued without *any* discovery taking place."). *Bucholzer* is therefore inapposite. Murphy tries to avoid this by arguing that his case is "virtually the same, because [he] was *deterred* from discovery . . . ." (emphasis added). However, "deterred" and "denied" are not the

same. Even if the deposition transcripts were a vital piece of discovery, which seems highly unlikely, Murphy still had several days to review the transcripts before his response was due. At most he was rushed, and only with regard to one piece of discovery—the transcript of a deposition. This was a piece of discovery that merely reproduced the information that he already could have gathered at the deposition itself. The district court did not abuse its discretion when it denied Murphy's 56(f) motion.

4

Murphy next argues that the district court shifted the burden of proof to him on damages, or, in an alternate phrasing, that Alliant did not satisfy its burden of proof with regard to damages. Specifically, he argues that the district court ignored Alliant's burden of proof, instead granting the motion because Murphy had not put forth "sufficient evidence of mitigation." App'ant Brief at 23.

We review the district court's grant of summary judgment de novo. *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, this court "must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52

(1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts

must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving

party's case, the nonmoving party must present "significant probative evidence" to demonstrate that

"there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris*

*Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough. *Id.* at 343.

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

After the district court decided the summary-judgment motion on liability in Alliant's favor,

the court waited several months before issuing its second summary-judgment order on damages.

During that time, the parties filed briefs on the issue of damages and the court conducted an

evidentiary hearing on the issue. At the hearing, Alliant specified its damages as follows:

> Development Deficit damages on five properties: $1,874,513, plus "prejudgment interest at
> 8 percent since the date of June 11, 2008."

> Rescission damages on the Renaissance property: $7,072,130.

In its brief specifically on damages and at the evidentiary hearing, therefore, Alliant claimed total

damages of $8,946,643.

Alliant based its summary-judgment motion on damages on claims for (1) the Development

Deficit amount for the five completed apartment buildings, and (2) rescission damages for the

incomplete apartment building. Alliant relied on the Development Deficit formula set forth in Article I of the LP Agreements, describing the formula as follows:

> After crediting Defendants for the proceeds of the capital contributions and the permanent loans to which they would ultimately become entitled, the Guarantor Defendants are required, *inter alia*, to pay all excess costs necessary to finish construction at the Apartment Buildings, to pay off all liens at the Properties, to pay off all the Limited Partnerships' Bridge Loans, and to convert the Multifamily Loans to permanent status.

Alliant claimed that the "only item which is not subject to precise computation" was the amount of the permanent loan to which the Guarantors would be entitled to, and thereby credited. Alliant stated that it therefore credited the defendants with the highest possible amount.

Regarding the incomplete building, Alliant claimed that it would have been more difficult to quantify the Development Deficit damages because the building was unfinished. Therefore, Alliant elected to take rescission damages, which, it claimed, "simply requires the Guarantor Defendants to pay Plaintiffs back for the amounts that Plaintiffs invested into the Renaissance Properties." Alliant attached an affidavit by Brian Doran, a representative of Alliant, that provided calculations of the Development Deficit and rescission amounts. Doran swore that Alliant had invested $8,598,085 in the six LPs. He broke out the methodology and calculations for the Development Deficits for the five properties, and the rescission methodology and calculations for the sixth, incomplete, property. He reached a total damages amount of $8,194,136.

Murphy argued in opposition to both the Development Deficiency and rescission damages Alliant claimed. In response to Alliant's Development Deficit damages calculations, Murphy argued that Doran only provided an "anonymously prepared spreadsheet" for Alliant's damages calculations,

with no "supporting documentation." He argued that the spreadsheet was hearsay and was not properly authenticated, arguments that he also makes on appeal. He objected to the calculations, arguing that they lacked authentication, contained hearsay, and provided no information about how they were performed.

In response to the rescission damages, Murphy argued that Alliant had waived its right to rescission damages by failing to request them until the summary-judgment stage and failing to mitigate damages, and that the district court improperly shifted the burden of proof to him on this issue. He argued that the record showed that Alliant had "numerous opportunities to obtain additional tax credits, or re-negotiate the loans, or even fund construction themselves," and these measures might have "reduced the so-called 'equity gap' upon which Plaintiffs' claims are based." *Id.* at 12. He also argued that there was evidence that "the properties" had a value of "at least $655,000" and that this value should be able to be offset against the amount owed to Alliant.

We review the district court's calculation of damages for clear error. *Ferndale Labs., Inc. v. Schwarz Pharma, Inc.*, 123 F. App'x 641, 648 (6th Cir. 2005). We review the district court's evidentiary determinations, such as the determination of whether evidence is hearsay, for an abuse of discretion. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 378 (6th Cir. 2009).

The district court did not abuse its discretion in accepting Doran's calculations to determine the amount of Developmental Deficit damages. The district court admitted Doran's calculations, over Murphy's objection of hearsay, as summaries admissible under FED. R. EVID. 1006 ("The proponent may use a summary . . . to prove the content of voluminous writings . . . that cannot be

conveniently examined in court."). Murphy does not argue that the evidence did not constitute a summary for the purpose of Rule 1006; he merely argues that it is hearsay. A properly admitted summary is not hearsay. Murphy's first argument is meritless.

Next, Murphy argues that Doran's calculations were not properly "authenticated." Evidence is properly authenticated when a witness with knowledge testifies that the evidence is what it claims to be. FED. R. EVID. 901(b)(1). Also, Rule 1006 requires that a party offering a summary for admission "must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Murphy does not argue that Doran, who attached an affidavit swearing to his personal knowledge of the calculation to the damages calculations, was not a person with knowledge. Also, Murphy does not argue that Alliant failed to make the originals or duplicates underlying the summary available to him for examination and/or copying. Therefore, the court's admission of the damage calculations was proper.

Nor did the court impermissibly shift the burden of proof to Murphy regarding mitigation of damages. It is well-settled that the party claiming a failure to mitigate has the burden of proof on that issue. *Fifth Third Bank v. Waxman*, 726 F. Supp. 2d 742, 751 (E.D. Ky. 2010) ("The burden of proof of establishing that the duty to mitigate has been violated is on the Defendants."). The purpose of requiring a plaintiff to mitigate its damages is to prevent avoidable or intentional waste on the part of the plaintiff. *Monumental Life Ins. Co. v. Nationwide Ret. Solutions, Inc.*, 242 F. Supp. 2d 438, 453 (W.D. Ky. 2003) ("The purpose behind [mitigation of damages] is clear: a party claiming damages resulting from someone else's wrongful conduct must take reasonable advantage

of opportunities to reduce or minimize losses once they know they are being damaged, otherwise, its actions are intentionally wasteful.") (internal citation omitted). A plaintiff's duty to mitigate "is not absolute; recovery is diminished only to the extent that the plaintiff fails to mitigate the damages as they would be mitigated by an ordinary, reasonable person under similar circumstances." *Morgan v. Scott*, 291 S.W.3d 622, 641 n.49 (Ky. 2009). Therefore, Murphy bore the burden of proving the means by which a reasonable party in Alliant's position would have mitigated damages. The district court held that Murphy failed to do so, because he "presented no evidence as to the reasonable actions that the Plaintiffs should have taken." *Ibid.*; *see also Fifth Third*, 726 F. Supp. 2d at 751 (same).

We agree with the district court's determination. Murphy stated in his Response to Summary Judgment that Alliant "had numerous opportunities to obtain additional tax credits, or re-negotiate the loans, or even fund construction themselves," in order to mitigate their damages. However, he failed to provide any evidence indicating that these were reasonable measures would be taken by a reasonable party in Alliant's position. *Summit Petroleum Corp. of Indiana v. Ingersoll-Rand Fin. Corp.*, 909 F.2d 862, 868 (6th Cir. 1990) ("[T]he defendants offered little more than conclusory statements to support their argument that [plaintiff] failed to mitigate damages."). Murphy's objection regarding mitigation of damages was properly denied.

Murphy also failed to prove the $655,000 value that he alleged the properties possessed and should be used as an offset of his damages. As the district court noted, Murphy failed to specifically

identify the documents or calculations he relied on to arrive at this figure. We agree with the district court that Murphy failed to raise a genuine fact question with regard to a potential offset.

Finally, the district court did not err when it granted rescission damages to Alliant despite its late invocation of the remedy. The district court recognized that the LP Agreement did not require Alliant to elect rescission damages at a certain time. In fact, as Alliant points out in its brief, the Guaranty Agreement contained a non-waiver provision: "No provision of this Guaranty Agreement or right of the Investor Limited Partner hereunder can be waived . . . except by a writing duly executed by the Investor Limited Partner or otherwise as expressly provided for herein." In his reply brief, Murphy does not dispute the existence or effect of this provision. Therefore, the documents between the parties expressly contemplate that Alliant's option to elect rescission damages was unwaivable unless waived as specified in the Guaranty Agreement. Murphy's argument must fail.

IV

For the foregoing reasons, the district court's grants of summary judgment for Alliant, both as to liability and as to damages, are AFFIRMED.